IN THE UNITED STATES DISTRICT COURT FOR THE **FILED**
EASTERN DISTRICT OF OKLAHOMA

AUG **2 6** 2008

**WILLIAM B. GUTHRIE**
Clerk, U.S. District Court
By_____
Deputy Clerk

UNION PACIFIC RAILROAD )
COMPANY, )
)
)
Plaintiff, )
)
v. )   Case No. CIV-06-094-KEW
)
THE UNITED STATES OF AMERICA, )
ex rel. THE U.S. ARMY CORPS )
OF ENGINEERS, )
)
Defendant. )

**OPINION AND ORDER**

This is an action based in the Federal Tort Claims Act
wherein Plaintiff Union Pacific Railroad Company ("Union Pacific")
alleges Defendant United States of America, ex rel. The U.S. Army
Corps of Engineers (the "United States") negligently breached
certain duties it owed to Plaintiff which resulted in significant
damage to Plaintiff's property.

Beginning on October 22, 2007, this Court conducted a Non-Jury
Trial with regard to the outstanding issues in dispute in this
action. After the presentation of evidence, the parties were
afforded the opportunity to file proposed findings of fact and
conclusions of law and written closing arguments, which were
submitted in a timely manner. This Court has considered all of the
evidence presented by way of live testimony, depositions, exhibits
and stipulations as well as the proposed findings and conclusions
in the formulation of this Order. After said consideration, this
Court hereby enters the following findings of fact and conclusions
of law in conformity with Fed. R. Civ. P. 52:

## FINDINGS OF FACT

### *Facts Relevant to All Claims*

1.  Union Pacific, as successor to the Missouri, Kansas & Texas Railway Company ("MKT"), owned and operated the rail line which forms the subject matter of this lawsuit. The United States is named in this case as it is admitted that the employees of the Army Corps of Engineers ("ACOE") were in all respects and at all relevant times acting within the scope of their employment and are, therefore, considered employees of the United States.

2.  On or about May 23, 2003, Union Pacific operated a train identified as MKCFQ-21 traveling south on the mainline track when it derailed about one mile south of Eufaula, Oklahoma. (Stip. Fact No. 8)[1]. As the train passed over certain culverts located underneath the train tracks, the culverts collapsed, resulting in the derailment of the train. (Stip. Fact No. 9). The culverts were made of metal and were installed into a dirt embankment upon which the railroad tracks on which MKCFQ-21 was traveling.

3.  The derailment site is located near the shoreline in Sections 2 and 11, Township 9 North, Range 16 East of the Indian Base and Meridian, McIntosh County, Oklahoma. (Stip. Fact No. 10). The derailment site is located in what is known as the Cherokee Subdivision. (Stip. Fact No. 11). Prior to and at the time of the derailment, the Cherokee Subdivision was being inspected by Union Pacific at least four times per week. (Stip. Fact No. 12).

---

[1]  All references to stipulated facts originate from the Revised Pretrial Order entered October 18, 2007.

2

4.     On September 24, 1959, Union Pacific (through its predecessor in interest the MKT) and the ACOE entered into a contract, identified as Contract No. DA-34-066-CIVENG-60-29 (the "Contract"). The Contract, along with all supplements thereto, sets forth the obligations of both parties to the contract. (Stip. Fact No. 14). The Contract provided that after inspection and determination that the work has been properly performed, the Owner will accept the completed sector for a ninety (90) day test period prior to final acceptance. (Stip. Fact No. 15). The Contract further provided for an additional five (5) year period after the date of final acceptance by the Owner, during which the Government will pay for deferred construction expenses for problems identified by the Owner. (Stip. Fact No. 16).

Pursuant to the Contract, after the expiration of the five year deferred construction period, the Owner "agrees to and does hereby release and agree to save and hold the Government harmless from any and all causes of action, suits at law or equity, or claims or demands, or from any liability of any nature whatsoever for and on account of any damages to the lands conveyed and utilities relocated hereunder or in any way growing out of the construction, operation and maintenance of the Project." (Stip. Fact No. 17).

5.     Lake Eufaula is a Civil Works Project under the jurisdiction and control of the United States, through the ACOE. (Stip. Fact No. 18).

6.     After the collapse of the culverts, the dirt embankment

3

and culverts were replaced by a bridge.

    7.    The parties have stipulated "as to the damages both reasonable and direct stemming from the subject derailment as presented in Union Pacifi's claim packet."    The damages Union Pacific cited in the claims packet total $4,456,606.70.    (Stip. Fact No. 5).    On April 11, 2007, the ACOE denied Union Pacific's claim.    (Stip. Fact No. 6).

*Facts Relevant to the Ownership Interest of the Parties*

    8.    The derailment occurred on two separate tracts identified during the trial as N-1422 and N-1423.    The tract known as N-1422 was acquired by condemnation in fee simple, subject to the existing railroad easement.    N-1422 is bordered on the east side by the centerline of the railroad track operated by Union Pacific.    The tract designated as N-1423 was directly purchased by the United States and is bordered on the west side by the centerline of Union Pacific's railroad tracks.    The United States acquired the property in fee simple subject to the existing railroad easements as the testimony of Joel Fuchs ("Fuchs"), a ACOE cartographer indicated.

    9.    The United States owns approximately 45 acres of property west of the railroad tracks to Highway 9.

    10.    Charles Schrodt ("Schrodt"), an environmental specialist with the ACOE testified that he determined at the time of the derailment that the site was owned by the ACOE from consulting the Geographic Information System ("GIS"), a computer inventory system maintained by the ACOE.    He stated that the tracts upon which the derailment occurred were "inside the digital boundary as indicated

4

on our GIS."

11.     ACOE's real estate officer for Lake Eufaula, Mike Love ("Love"), testified that to his knowledge, no entity other than the ACOE owns a fee interest in land in the Eufaula Reservoir, including Union Pacific.     He did reference two privately held properties where the ACOE has water for the reservoir – testimony which differed from his deposition.     Nevertheless, Love maintains that he believes all lands that run through the reservoir waters were and are owned by the ACOE.  He defers any questions concerning the precise ownership interests in the land encompassed by the reservoir to Fuchs, the ACOE cartographer.

12.     In determining the placement of a staging area after the derailment, Love told Schrodt that the tract identified as N-1423 had a fee simple interest retained by the United States.     The licensing paperwork which permitted the staging area indicated that the ACOE possessed a fee simple interest in N-1423.  Indeed, Love testified that in accordance with his training by the ACOE, if the number associated with a tract of land does not end with an "E," the ACOE owns the tract in fee simple.  Neither of the numbers of the two tracts where the derailment took place ends with an "E."

13.     Love originally told Schrodt or field personnel that the ACOE did not own the land where the derailment took place based upon Schrodt pointing to the place of derailment on a map. However, Love pulled maps for tracts not involved in the derailment.     Based upon what he now knows from Fuchs that the correct point of derailment encompassed tracts N-1422 and N-1423,

5

Love believes his prior statements to field personnel that the ACOE did not own the tracts was incorrect.

14. Schrodt told Norman Kirk of Union Pacific that the ACOE had previously been inspecting the railroad tracts and structures but stopped or was lessened by budgetary constraints. Schrodt now believes that statement was in error because the ACOE does not own the land where the tracks and culverts were located. Schrodt bases his opinion on what Love told him concerning the ownership of the tracts involved in the derailment, which has been determined to have been mistaken, and because of a trip to the McIntosh County Courthouse and a review of the land records. However, the language in the land records upon which Schrodt relies to determine Union Pacific possesses a fee simple interest in the tracts involved instead only identifies that the railroad shall have sole occupation/possession of the land – language consistent with a railroad easement. Schrodt admitted that he did not have legal expertise to interpret the document and was not familiar with railroad easements.

15. Frank J. Fillebeck, Jr. ("Fillebeck"), a right-of-way engineer for Union Pacific, testified by deposition. Fillebeck was responsible for maintaining and evaluating railroad valuation maps. Fillebeck testified that the original interest of the railroad in the derailment site lands was established in a grant by Act of Congress in 1866. However, by condemnation in 1962, Fillebeck testified that the fee simple interest of the railroad was acquired by the United States, subject to an easement of the railroad. In

6

his opinion from reviewing the railroad's documentation, Fillebeck determined the railroad owned no fee simple interest in the derailment site.

16.     The ACOE did not provide an outgrant, or written permission for the railroad to operate on Federal property, to Union Pacific or its predecessor.

**Facts Relevant to the Duty to Inspect and Maintain**

17.     Jeff Knack ("Knack"), the lake manager for ACOE at Lake Eufaula, testified that should the ACOE own the culverts, the ACOE would have a duty to inspect them because the culverts are necessary to maintain the flood waters on the west side of the railroad tracks.   Knack also agreed that the ACOE regulates the area west of the railroad tracks to Highway 9 just as it would any other area owned by the ACOE in fee simple, including the land situated on the east side of the railroad tracks.   ACOE regulates the level of the water on the west side of the tracks just as it does everywhere else on the lake.

18.     Ralph Hight ("Hight"), the current chief of the engineering and construction division of the ACOE, testified that the ACOE is responsible for regulating the water height on both sides of the embankment.  Hight further testified that if the ACOE have an ownership interest in facilities and structures, it has a duty to maintain them.  Hight stated the culverts could be referred to as drainage structures.

19.     John Wagoner ("Wagoner"), the current chief of the technical support branch, operations division of the ACOE, stated

7

that the ACOE maintains those constructs for flood control that it operates and owns. Wagoner agreed that the culverts at issue in this case could be referred to as drainage structures.

20. Rob Stallings ("Stallings"), owner and CEO of Envirotech Engineering, an environmental consulting and civil engineering firm retained by Union Pacific as a hydrology expert. Stallings testified that with a two-year rain event, the resulting water would overtop the railroad without the culverts in place. He also stated that with a 50-year storm event, Highway 9 and the railroad tracks would be flooded. With a 100-year storm event, Highway 9, the railroad tracks, and the City of Eufaula would be impacted by flooding if the culverts were not in place to permit water to pass to the west side of the lake.

21. Russell Holeman ("Holeman"), chief of hydrology and hydraulics branch of the ACOE in Tulsa, Oklahoma, testified as ACOE's expert on hydrology. He considered the only "water management tool" at Lake Eufaula to be the dam itself. Holeman considers "water management" over which the ACOE has control to only include the holding and releasing of water through the dam. He does not consider the presence of the embankment to impact upon water management at the lake. In Holeman's opinion, the embankment's purpose was limited to providing the railroad a means to pass over one section of the lake.

Holeman stated the metal culverts that were in place allowed the natural drainage to flow to the lake but did not impact water management. Holeman also did not consider the culverts to be

8

"flood-control devices," a term with which he admittedly was not familiar.

Holeman did not "quibble" with the methodology utilized by Stallings in reaching his conclusions. Holeman considered them "standard methods that are utilized." Holeman stated, however, he had not looked at the models developed by Stallings.

Holeman agreed that the size of the culverts and the materials utilized for their construction would be determined by the ACOE in order to serve the necessary hydraulic function allowing water to equalize on both sides of the railroad. Holeman also agreed that if the culverts were not present or were collapsed, water would pond on the west side and the reservoir would build up to its level on the east side.

22. Knack also testified that the culverts serve a necessary hydrologic function to maintain the waters of the lake on the west side of the railroad tracks. He stated that the ACOE has to maintain all structures and facilities to maintain maximum benefits. However, he believes the ACOE was not required to maintain the subject culverts.

23. Schrodt testified that the culverts were necessary for the efficient operation of the reservoir, although he did not consider the culverts to be flood-control facilities.

### *Facts Relevant to the Negligent Breach of Contract Claim*

24. George Meyer ("Meyer"), the manager of special projects for structures design for Union Pacific, testified that the Contract at Appendix A required all culverts below an elevation of

9

585 m.s.l. be constructed of reinforced concrete. Meyer stated the ACOE was responsible for building the embankment and placing the culverts. MKT, the original contracting railroad, was responsible for installing the railroad track.

25. The Contract, the only document approved in writing by the railroad, did not provide for the level of elevation for the culverts. Meyer concluded the metal culverts should only have been installed if the culverts were placed at an elevation above 585 m.s.l. Reinforced concrete should have been used if the culverts were installed at an elevation below 585 m.s.l.

26. ACOE contends the Supplement No. 5 to Design Memorandum No. 18, Relocation of U. S. Highway 69 and Missouri-Kansas-Texas Railroad, Eufaula Reservoir (Plaintiff's Exhibit No. 19) indicates the change from concrete culverts to metal culverts was made in order to reach agreement with the railroad. Meyer testified and subparagraph g to Supplement No. 5 demonstrates the "agreement" of the railroad referenced the manner of construction of the grade raise in the 4800 foot section. Originally, the plan provided for the extension of the passing track and installation of a shoofly. Instead, the plan to which the railroad agreed provided for the removal of the existing passing track and raising under traffic the main track. The passing track extensions were to be installed elsewhere.

27. Meyer also stated the Contract required ACOE to provide MKT with "as built" drawings. No evidence was introduced at trial to indicate MKT ever received or approved any "as built" drawings

10

reflecting any changes to the Contract requirements on the materials to be used in the culverts at specified elevations. The Contract required any changes in the design and specifications to be approved in writing by the Owner (MKT).

28. A letter from the chief engineer of the railroad was concerned that the plan showed metal culverts submerged or below the power pool elevation of 585. The chief engineer stated that all such culverts must be constructed of reinforced concrete.

29. Meyer testified that placing metal culverts where they will be continually inundated with water is not within the standards of Union Pacific or any railroad. Submerged culverts are constantly subjected to wave action that erodes metal away from the culvert. Coatings for the metal culverts are unsatisfactory.

30. Hans Iwand ("Iwand"), a licensed metallurgist and mechanical engineer, testified for Union Pacific as an expert witness. Iwand examined the scene of the derailment. Upon evaluation, Iwand determined that the corrosion at the waterline on the metal culverts caused their failure. The portion of the culvert exposed to air caused it to corrode and rust. The corrosion occurred along a knife line that runs the length of the pipe, accounting for its collapse.

Iwand testified that, under the applicable engineering standards, it is not a proper application of galvanized, corrugated metal to place it in a location where it will be continuously exposed to water. If it is placed in such an environment, the metal will degrade at an accelerated rate. In their use at that

11

derailment site, the pipes themselves met or exceeded engineering standards for the overburden weight placed above them but their utilization in the particular environment violated those standards.

31. Holeman also testified that metal pipes subject to wave action have a tendency to corrode and have a shorter life span than concrete. He stated it was not a common practice to use coated metal culverts in earth where they would be continually submerged in water, but he has seen in accomplished in some cases. Holeman opined that it would not be his preferred method to use metal pipes in such an environment, but that it was up to each designer that designed the particular project. He testified that he had not been involved with a project that used such materials in those conditions.

32. Meyer testified that an examination of the records on the rail line where the derailment took place reveals all of the culverts north and south of the derailment site are made of concrete. Holeman, Stallings, and Iwand agree that if reinforced concrete had been utilized in the construction of the culverts, the culverts would not have been expected to fail as the design life of concrete is considerably longer than metal.

33. Knack and Schrodt testified that the ACOE was not aware of the existence of the culverts. Moreover, Union Pacific's alignment maps did not have the culverts marked on them.

34. Meyer also testified that it is not inherently improper to use metal culverts so long as they are not submerged. Therefore, if the railroad's resident engineer on the project would

12

have seen the metal culverts, he would not have necessarily known the elevation of the culverts or known that they were eventually subject to submersion in water. During construction, water was not present at the embankment site.

35. At the time of construction, the culverts were placed five feet below the point of continual submersion. The flowline of the culverts was seventeen feet below the level of the track. Meyer testified that only a survey crew would have been able to accurately determine the elevation of the culverts. He further stated that the fact the culverts were placed five feet below the water level by ACOE would not have been readily apparent to the railroad's resident engineer. ACOE was required to perform all surveys and subsurface investigations in order to effect the work provided under the Contract.

36. During the construction of the culverts, ACOE determined that it did not have adequate space to construct a 10' x 10' reinforced concrete culvert between the vertical pilings of the old bridge that predated the embankment structure. Meyer stated the limitation in space did not require the change in materials to be used in the culverts from reinforced concrete to metal. Rather, Meyer testified two barrels of reinforced concrete as large as 7' x 8' could have been constructed between the pilings without interrupting track service.

## CONCLUSIONS OF LAW

A. This Court possesses the appropriate jurisdiction over the parties and subject matter of this action, which was commenced

13

pursuant to the Federal Tort Claims Act ("FTCA") against the United States. 28 U.S.C. § 1346(b). Further, venue is proper in this district. 28 U.S.C. § 1391(e).

B. Any finding of fact which is more appropriately described as a conclusion of law shall stand as such. Similarly, any conclusion of law which might be considered as a finding of fact will be so deemed.

C. Union Pacific has exhausted its administrative remedies prior to the initiation of this action. 28 U.S.C. § 2675.

D. As reflected at trial, Union Pacific asserts three bases for relief in this action – (1) negligent breach of the Contract; (2) negligent failure to inspect and maintain the culverts at issue in this case; and (3) abuse of agency discretion. Absent a waiver of sovereign immunity, the federal government is immune from suit. Loeffler v. Frank, 486 U.S. 549, 554 (1988). However, the FTCA waives sovereign immunity for actions against the United States resulting from injuries caused by the negligent acts of governmental employees while acting in the scope of their employment. 28 U.S.C. § 1346(b)(1). The United States can be held liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. To determine the liability of the federal government under the FTCA, it is necessary to apply the law of the place where the alleged negligence occurred. 28 U.S.C. § 1346(b); Ewell v. U.S., 776 F.2d 246, 248 (10th Cir. 1985) citing Richards v. United States, 369 U.S. 1, 9 (1962). In this instance, the laws of the State of

14

Oklahoma will govern the claims based in negligence in this action.

E.    Union Pacific's first two claims are founded in negligence.    Under the prevailing case authority in Oklahoma, a plaintiff must prove the following elements by a preponderance of the evidence – (1) a duty of care owed by defendant to plaintiff; (2) defendant's breach of that duty; and (3) injury to plaintiff caused by defendant's breach of that duty.    Lowery v. Echostar Satellite Corp., 160 P.3d 959, 964 (Okla. 2007) citing Nicholson v. Tacker, 512 P.2d 156, 158 (Okla. 1973) and Thompson v. Presbyterian Hosp., Inc., 652 P.2d 260, 263 (Okla. 1982).

F.    The question of whether a duty of care is owed by plaintiff to a defendant is a question of law for the Court.    Id. citing Delbrel v. Doenges Bros. Ford, Inc., 913 P.2d 1318, 1320 (Okla. 1996).    If no duty is owed by defendant to plaintiff, no liability for negligence attaches as a matter of law.    Id. citing First Nat'l Bank in Durant v. Honey Creek Entertainment Corp., 54 P.3d 100 (Okla. 2002).

The Court first turns to Union Pacific's claim for negligent breach of contract.    Union Pacific claims ACOE's duty to it arose from the Contract itself.    Under Oklahoma law,

> [a]ccompanying every contract is a common law duty to perform the contract with care, skill, reasonable experience and faithfulness the thing agreed to be done. A negligent failure to perform these duties is a tort and a breach of contract.    An action for breach of contract and an action in tort may arise from the same set of facts.
>
> Leak-Gilbert v. Fahle, 55 P.3d 1054, 1059 (Okla. 2002).

Thus, ACOE owed a duty to perform the Contract with the

15

applicable care and skill required for performance.

G. Union Pacific contends ACOE breached the duty of care owed to it by installing metal culverts in an area where they would be continually submerged in water. Holeman, Stallings, Meyer, and Iwand all testified that corrosion due to wave action would predictably result from such a placement of metal pipe. The evidence adduced at trial indicates that the use of metal culverts in those conditions is a violation of applicable engineering standards - the same standards that would have been in effect at the time of the construction of the culverts by ACOE. No expert in the field who testified at trial condoned the use of metal pipes in a submerged area. Indeed, to a man, the experts agree that had reinforced concrete been utilized in the construction of the culverts, the collapse and resulting derailment would have been avoided. As a result, this Court concludes ACOE breached the duty established under Oklahoma law which it owed to Union Pacific through its predecessor to perform the contract with due care and engineering skill.

H. ACOE offers several defenses to the use of the metal culverts. It is clear the original version of the Contract provided for the use of reinforced concrete. ACOE asserts the change in materials was tacitly approved by the railroad as reflected in Supplement No. 5 represented in Plaintiff's Exhibit No. 19. Subparagraph (g) of that Supplement states changes to the original plan were necessary "[i]n order to reach agreement with the Railroad Company. . . ." However, it is clear that the

16

modification in design to which the railroad was agreeing referenced in the Supplement addresses the placement of a passing track not the substitution of materials in the culverts. Therefore, this provision does not demonstrate acquiescence in the change as urged by the ACOE.

I. ACOE also contends the negligent breach of contract claim has been waived by the terms of the Contract. Specifically, the railroad was to have a resident engineer on site during the performance of the contract and inspect the work of the ACOE. ACOE argues the failure to object within the period set out in the contract waives any claim associated with the construction of the project now.

Union Pacific first argues that contractual defenses are not available as a defense to the tort asserted. The negligence claim associated with the breach of a contract is not unique from other forms of negligence. Clearly, exculpatory clauses in contractual agreements precluding liability for negligent acts such as personal injury are generally enforceable, subject to scrutiny. Schmidt v. United States, 912 P.2d 871, 874 (Okla. 1996). Consequently, ACOE may validly assert the defenses of waiver and release in this action.

ACOE first contends the waiver contained in the Contract is enforceable to preclude recovery in this case. Any waiver must be knowing and based upon consideration. Robberson Steel Coi. v. Harrell, 177 F.2d 12, 15 (10th Cir. 1949). The evidence indicated the placement of the culverts at the particular elevation

17

determined by ACOE would not have been apparent to the railroad's resident engineer, absent a survey for which ACOE was responsible. Since the elevation level of the culverts was not revealed in the schematic drawings, ACOE did not provide "as built" drawings to the railroad, and the change in materials was not approved by the railroad in writing as required by the Contract, it cannot be said the railroad knowingly waived its negligence claim for a breach of ACOE's duty to perform its obligations under the Contract with skill and care.

J. ACOE also relies upon an exculpatory clause in the Contract to avoid liability in negligence. The specific clause at issue is found at Article 10 of the Contract. It provides

The Owner agrees on completion of the relocation and/or alteration work provided herein, to accept the payment and that portion of the work to be performed by the Government provided for in Article 3 above as full and just compensation for any and all damages and injury that have been caused or that may be caused to the facilities relocated hereunder by reason of the construction and maintenance of the Project by the Government; and upon final payment and completion of the work to be performed by the Government as herein provided, the Owner agrees to and does hereby release and agree to save and hold the Government harmless from any and all causes of action, suits at law or equity, or claims or demands, or from any liability of any nature whatsoever for and on account of any damages to the lands conveyed and utilities relocated hereunder or in any way growing out of the construction, operation and maintenance of the Project.

Contract, Joint Exh. No. 1, p. 29.

Exculpatory clauses in Oklahoma are accepted but considered "distasteful." Schmidt, 912 P.2d at 874. Such clauses are subject to a three-part validity test, described as "a gauntlet of judicially-crafted hurdles": "(1) their language must evidence a

18

*clear and unambiguous* intent to exonerate the would-be defendant from liability for the sought-to-be-recovered damages; (2) at the time the contract (containing the clause) was executed there must have been *no vast difference* in bargaining power between the parties; and (3) enforcement of these clauses must never (a) be injurious to public health, public morals or confidence in administration of the law *or* (b) so undermine the security of individual rights vis-a-vis personal safety or private property as to *violate public policy.*" Id. Union Pacific contends none of these criteria are met in the exculpatory clause at issue in this case.

To meet the first criteria, the provision must "clearly and cogently (1) demonstrate an intent to relieve *that person* from fault and (2) describe the nature and extent of damages from which that party seeks to be relieved." Id. An exculpatory clause does not have to contain the word "negligence" to be considered sufficiently clear. Kinkead v. Western Atlas Internat'l, Inc., 894 P.2d 1123, 1128 (Okla. Ct. App. 1993) citing Transpower Constructors v. Grand River Dam Auth., 905 F.2d 1413, 1420 (10th Cir. 1990). Union Pacific first contends the exculpatory clause in the Contract is not sufficiently clear, primarily because of the use of the term "relocation" in the clause. However, the clause clearly seeks to relieve the United States and the ACOE from liability and encompasses actions "growing out of the construction, operation and maintenance of the Project." This all-encompassing language unambiguously covers the construction of the embankment

19

and installation of the culverts.

At the time of the execution of the exculpatory clause, a vast difference in bargaining power must not exist to the parties to the agreement. Courts examine two factors in determining the relative bargaining power of the parties - "(1) the importance of the subject matter to the physical or economic well-being of the party agreeing to the release; and (2) the amount of free choice that party could have exercised when seeking alternate services." Id. Undoubtedly, the construction of the embankment was important to the railroad as it was equally important to the ACOE in order to facilitate the construction and operation of Lake Eufaula. Moreover, due to the unique nature of the project, neither party had an alternative to one another with which to bargain in order to achieve the results sought. On the whole, Union Pacific failed to present evidence on the bargaining power of the respective parties to the Contract, much less its unequal character.

Exculpatory clauses are not permitted if their enforcement would result in an injury to public health. On this account, the evidence indicates that enforcement of the clause in this case would indeed be injurious to the public. Without the culverts or some other method of permitting the waters to flow on both sides of the railroad track, such as a bridge, flood waters would overtop Highway 9 and parts of the City of Eufaula. Enforcement of the clause in this case would permit the ACOE to avoid liability for improper construction of the culverts, any attendant duty to inspect and maintain the structures, and any damages resulting to

20

the public from either event. As a result, this Court will not enforce the exculpatory clause in the Contract to permit the ACOE to avoid liability in this case.

K. The final element necessary to prove Union Pacific's negligent breach of contract claim is the presence of damages proximately caused by the breach of the duty owed. It is stipulated that the collapse of the culverts resulted in damages to Union Pacific in the amount of $4,456,606.70. Judgment on this claim will be entered accordingly.

L. Union Pacific next asserts a claim for negligent failure to maintain and inspect the culverts at issue. As reflected in the Findings made herein, the evidence indicates the ACOE possesses a fee simple interest in the subject property where the culverts were located, subject to the railroad easement currently held by Union Pacific. Testimony from Fuchs, Knack, Schrodt, Love, and Meyer supports this conclusion. While at times during the aftermath of the collapse there appears to have been some level of confusion over the particular tracts involved, the testimony evinces the ACOE's ownership interest. The fact an outgrant was not apparently provided to the railroad does not definitively prove ownership - it may merely demonstrate the ACOE overlooked providing the outgrant. Indeed, had an outgrant been issued, the evidence indicated the subject property would have been included in the ACOE's inspection regimen.

M. The culverts served a necessary hydraulic function in permitting water to flow to the west side of the lake and diminish

the likelihood of flooding under certain conditions of Highway 9 and the City of Eufaula. Since the ACOE owned the subject property where the embankment and culverts were located, it could fully exercise its rights of ownership in the fee estate in any manner and for any purpose which did not interfere with Union Pacific's use of its easement. Kirby-Smith Machinery, Inc. v. City of Okla. City, 19 P.3d 331, 333 (Okla. Ct. App. 2000). So long as the construction and operation of the culverts did not interfere with the railroad's operation, the ACOE could affect the substrata under the railroad track. However, the ACOE had a duty to maintain the property it owned such that the railroad's operation was not affected. The breach of that duty and the resulting damages sustained by Union Pacific give rise to the recovery of the railroad's losses sustained when the culverts collapsed.

N. The final avenue for recovery sought by Union Pacific alleges the ACOE abused its discretion in denying compensation for Union Pacific's losses associated with the derailment. Union Pacific relies upon the authorization contained in 33 U.S.C. § 701q, which provides

§ 701q. Repair and protection of highways, railroads, and utilities damaged by operation of dams or reservoir

Whenever the Chief of Engineers shall find that any highway, railway, or utility has been or is being damaged or destroyed by reason of the operation of any dam or reservoir project under the control of the Department of the Army, he may utilize any funds available for the construction, maintenance, or operation of the project involved for the repair, relocation, restoration, or protection of such highway, railway, or utility: *Provided,* That this section shall not apply to highways, railways, and utilities previously provided for by the Department of the Army, unless the Chief of Engineers

determines that the actual damage has or will exceed that for which provision had previously been made.

On April 11, 2007, the ACOE denied a claim for compensation as a result of the derailment and Union Pacific asserts the denial constitutes an abuse of agency discretion. The only facts which Union Pacific directs this Court in support of this contention is (1) testimony from Knack wherein he agreed with counsel when asked, ". . . the Corps of Engineers has on occasion made repairs to private property caused by wave action"; (2) testimony from Angie McPhee, chief of acquisition and realty services branch of the ACOE in Tulsa, Oklahoma, wherein she states that, as far as she recalls, every time a private party has made a claim against the corps at Lake Eufaula, including some made 15 to 20 years ago, it has paid the claimant. No other evidence surrounding the ACOE's decision was introduced into the record.

More importantly, the claim was denied by letter from Col. Charles D. Hayes, Jr. (Plaintiff's Exh. No. 2). In the letter, Col. Hayes indicates the claim is denied, "[b]ecause Union Pacific Railroad Company has filed suit against the United States in the United States District Court for the Eastern District of Oklahoma, its claim is no longer amenable to administrative resolution." This lawsuit was filed March 6, 2006, in advance of the denial of Union Pacific's claim.

Judicial review of a governmental administrative decision is governed by 5 U.S.C. § 706, which provides

**§ 706. Scope of review**

To the extent necessary to decision and when presented,

23

the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall-

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be -

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

\*    \*    \*

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

It is impossible for this Court to conclude that the ACOE's decision to deny compensation to Union Pacific was arbitrary and capricious, since it was merely based upon the fact Union Pacific initiated this lawsuit and not on the merits of the claim. Further, Union Pacific presents scant evidence on the prior claims allegedly made to the ACOE for wave action damage. The recollections of the claims in the testimony are somewhat murky and general. Union Pacific has wholly failed to present any evidence of the similarities between the claims which have been asserted by others in the past and those asserted by Union Pacific in this case. Without that evidence, this Court cannot conclude the decision to deny the claim based upon the filing of this action was arbitrary or capricious.

O. Union Pacific also includes arguments and authorities in its briefing contending that the ACOE does not enjoy the

protections of the discretionary function exception to liability provided by the Federal Tort Claims Act. This Court finds no argument in this regard by the ACOE in its briefing. Therefore, further discussion of this legal issue is not necessary.

IT IS THEREFORE ORDERED, ADJUDGED, and DECREED that judgment is entered in favor of the Plaintiff, Union Pacific Railroad Company, and against the Defendant, United States of America, *ex rel.* the United States Army Corps of Engineers in the total amount of $4,456,606.70.

A separate judgment shall issue forthwith.

IT IS SO ORDERED this ___26th___ day of August, 2008.

KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE